UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ROSALIND A. CLAYTON, )
)
    Plaintiff, )
)
    v. )     Case No. 4:23-cv-01186-SRC
)
UNITED STATES POSTAL SERVICE )
et al.,[1] )
)
    Defendants.

## Memorandum and Order

Rosalind Clayton works for the United States Postal Service. Over the last few years, she's had several negative interactions with her coworkers, supervisors, and union. Believing the Postal Service and the American Postal Workers Union ignored her numerous complaints, discriminated against her, and violated other rights, she sued both. After multiple cycles of motions to dismiss, multiple substitutions of parties, and multiple attempts by Clayton to amend her complaint, Defendants move to dismiss once again.

## I. Background

### A. Complaint

The Court summarizes Clayton's allegations below. Due to the length and complexity of Clayton's complaint, and the fact that both motions to dismiss and motions for summary judgment pend before the Court, the Court summarizes the complaint primarily for background purposes. In the relevant discussion sections, the Court goes into more detail about the allegations that the Court finds well-pleaded for motion-to-dismiss purposes and the facts that

---

[1] Doug Tulino became interim United States Postmaster General on March 24, 2025. Pursuant to Federal Rule of Civil Procedure 25(d), the Court "automatically substitute[s]" Doug Tulino for Louis DeJoy as a defendant in this suit.

the Court finds undisputed for summary-judgment purposes.

Clayton alleges the following.  She describes herself as "60[-]years old, black, Christian," and a "woman."  Doc. 103 at 2.[2]  She works for the Postal Service and is a member in good standing with the Union.  *Id.*  In 2022 and 2023, she experienced several disagreements with co-workers, supervisors, and union representatives, which resulted in Clayton's filing of both Equal Employment Opportunity complaints—complaints filed with the Postal Service's EEO office—and union grievances.  *See generally* doc. 103.

The Court relates the alleged disputes chronologically.  In July 2022, Mercedes Spain, Clayton's coworker, "cursed [Clayton] out," saying, "Rosalind[,] don't say [a] M.F. thing to me any time you say anything to me I'm going to curse u [sic] out."  *Id.* at 13–14.  After, a supervisor and union steward interviewed another employee about the interaction but did not interview Clayton.  *Id.* at 13.  About a week later, Clayton filed an EEO complaint for this incident.  *Id.*; *see* doc. 103-1 at 27–28.  And two days after that, Clayton filed a second EEO complaint.  Doc. 103 at 14; *see* doc. 103-1 at 29–30.  Clayton alleges that Spain, among other things, got more help with her workload than Clayton got.  Doc. 103 at 14.  Then in August 2022, an EEO specialist sent Clayton a letter, providing her with the necessary information for filing a formal complaint.  *Id.*; *see* doc. 103-1 at 31.

In September 2022, Spain again "cursed . . . out" Clayton, stating:  "look at the wig"; "B**ch yo old a** in here throwing mail"; "you're miserable"; "you are a hypocrite singing church songs"; "I don't like you or your husband."  Doc. 103 at 14 (expletive alterations added).  Clayton then spoke with a supervisor, but the supervisor failed to interview her.  *Id.* at 15.  A few days later, another coworker, Ronald Cameron, charged and yelled at Clayton, by saying, "what!

---

[2] The Court cites to page numbers as assigned by CM/ECF.

what! what!" and "your old a** is the one who is stealing time." *Id.* at 15 (expletive alterations added).  Clayton reported this incident to three supervisors. *Id.*  Near the end of September, Clayton filed two separate union grievances, complaining about the behavior of Spain and Cameron. *Id.* at 15–16; *see* doc. 103-1 at 6–7.

Also in September 2022, the Postal Service issued a schedule-change letter, instructing Clayton to report at 9:00 p.m—changing her "regular" hours of 7:00 p.m.–3:30 a.m.  Doc. 103 at 15–16, 18; *see* doc. 103-1 at 8.  Opposed to the change, Clayton called a manager three times with no answer, and the manager never returned her calls.  Doc. 103 at 16.  A day after receiving the letter, Clayton filed a union grievance, complaining that the "sudden schedule change eliminated [her] Sunday premium wages." *Id.*; *see* doc. 103–1 at 9.

Proceeding into October 2022, Cameron's behavior persisted.  He "chanted for more than 60 days":  "you so ugly, I am about to throw up"; "you old"; "you broke"; "God has been good to you but he show [sic] aint [sic] done a damn thing for your son."  Doc. 103 at 16.  Because of this, Clayton complained to a supervisor. *Id.* at 11.  The next day, Clayton attended a meeting with Cameron, the supervisor, and a union steward, and the supervisor said, "I don't know what's going on, but I want it to stop." *Id.* at 17.

In mid-October, the Postal Service issued a second schedule-change letter, but it contained the same date as the first. *Id.*; *see* doc. 103-1 at 10.  The schedule change required Clayton to clock in at the same time as Cameron.  Doc. 103 at 17.  And it also eliminated half of Clayton's Sunday hours, which caused Clayton to lose out on $120 per week in premium wages. *Id.* at 19.  About a week later, Clayton filed a union grievance to complain about the schedule-change letter. *Id.* at 17–18; *see* doc. 103-1 at 23.  And shortly after that, Clayton filed a third EEO complaint.  Doc. 103 at 18; *see* doc. 103-1 at 32–33.

3

When Clayton refused to clock in at 9:00 p.m., the Postal Service issued her a "PDI" (pre-disciplinary interview). Doc. 103 at 18. Then in mid-November 2022, management told Clayton that her schedule would not change and instructed her not to work any overtime. *Id.* Clayton continued to work her "regular" hours (7:00 p.m.–3:30 a.m.). *Id.* Following this, three paychecks in October and November 2022 differed from the hours Clayton actually worked. *Id.*; *see* doc. 103-1 at 38–41. And because of these discrepancies, Clayton filed four union grievances in November and December 2022. Doc. 103 at 19; *see* doc. 103-1 at 12–17.

Near the end of 2022, a supervisor sent Clayton two letters regarding her work schedule: (1) for a pre-disciplinary interview and (2) as a disciplinary warning. Doc. 103 at 20; *see* doc. 103-1 at 18–19. In response, Clayton filed a union grievance, complaining of the "fraudulent letter of warning" and "fraudulent absence." Doc. 103-1 at 21; *see* doc. 103 at 20. And Clayton filed an EEO complaint regarding her schedule and wages. Doc. 103 at 21; *see* doc. 103-1 at 34–35.

On December 30, 2022, Clayton and Spain got into another dispute. Doc. 103 at 21. While Clayton looked at Spain, Spain asked her what she was looking at. *Id.* Clayton responded, "you." *Id.* And when Spain asked, "is that all you have to say[?]" Clayton replied, "God granted me the gift of sight[.] I should be able to look at whatever I choose." *Id.* After this interaction, Clayton verbally complained to two supervisors. *Id.*

The quarrel continued the next day. When Clayton arrived at work, Spain approached her and, while chest-to-chest, asked Clayton, "what was all that sh*t you were talking[?]" *Id.* (expletive alteration added). Clayton denied "talking sh*t." *Id.* (expletive alteration added). Spain then walked off, bumped Clayton's shoulder, and told Clayton, "swing." *Id.* Soon after, Clayton called a union representative and said that Spain "physically [and] verbally assaulted"

4

her.  *Id.*  Then Clayton told a supervisor.  *Id.*  Further, Clayton filed a union grievance the

following day, but the Union could not find it and failed to process it.  *Id.* at 21–22; *see* doc.

103-1 at 2.

On January 2, 2023, Clayton finished work in the morning and did not return until

January 5.  Doc. 103 at 22.  During this time, Spain accused Clayton, without Clayton's

knowing, of pulling a knife on Spain and threatening her.  *Id.* at 4.  So when Clayton returned to

work, Postal Police searched her, but they did not find a knife.  *Id.* at 22.  Because of this

incident, the Postal Service suspended both Clayton and Spain—Clayton for 23 days and Spain

for three days.  *Id.* at 2.  A supervisor told Clayton that she was suspended "indefinitely" pending

an investigation for "ongoing issues."  *Id.* at 4.  The Postal Service immediately placed Clayton

on "Emergency Placement."  *Id.* at 5.

Clayton filed another EEO complaint a day after the suspension.  *Id.* at 22; *see* doc. 103-1

at 36–37.  And about a week later, she received a letter of suspension, which stated:  "On

January 02,[]2023 an[] incident report was filed with the US Postal Police claiming that you

physically and verbally harassed another employee."  *Id.* at 4; *see* doc. 103-1 at 1.  The Postal

Service did not provide Clayton with a copy of the police report, and it did not interview her

during the investigation.  Doc. 103 at 4–5.  According to Clayton, this response stands in stark

contrast to the Postal Service's treatment of different employees.  *Id.* at 7–8.  The Postal Service,

Clayton alleges, never suspended a twenty-eight-year-old male employee for as long as it

suspended Clayton, even though that employee had regularly fought with his girlfriend.  *Id.* at 8.

And, Clayton further alleges, the Postal Service never suspended a white, male employee for 23

days, even though that employee had "fought with coworkers [and] management on a regular

basis."  *Id.*  at 7.

Also during January 2023, the Union issued Clayton a settlement for a prior grievance. *Id.* at 23; *see also* doc. 103-1 at 26. Clayton neither understood nor consented to the settlement. Doc. 103 at 23. Additionally, the Union told Clayton that it would get her paid for the one-and-a-half days of her suspension. *Id.* But, as of the filing of her second amended complaint, Clayton had not received a reimbursement. *Id.*

When Clayton returned to work in February 2023, she attended a meeting with a supervisor and told him that nothing happened on January 2. *Id.* at 9. Further, she asked a union representative why she was suspended for 23 days, and the representative told her that Spain accused her of pulling a knife and threatening Spain. *Id.* at 4. The Postal Service mailed Clayton a suspension letter in March 2023. *Id.* at 8. The letter proposed that the Postal Service would suspend Clayton for fourteen days for "unacceptable conduct." *Id.*; doc. 103-1 at 3. In August 2023, the Union settled two grievances—again without Clayton's consent. *Id.* at 20; *see* doc. 103-1 at 24–25.

Between late June and early July 2024, Clayton took a vacation. Doc. 103 at 3. Or at least she tried to—instead of giving her vacation time, the Postal Service issued Clayton sixteen hours of leave without pay (LWOP) and marked her as absent without leave (AWOL) for eight hours. *Id.*[3] When Clayton raised this issue with a supervisor, the supervisor told Clayton that Clayton had "signed up for the wrong vacation." *Id.* In August 2024, the Postal Service finally paid Clayton for this vacation. *Id.* But Clayton claims that a discrepancy existed between the amount on her pay stub and the amount of the base salary that she was supposed to make. *Id.* Clayton reported this to a union representative. *Id.* Not only did the representative fail to timely

---

[3] A discrepancy exists between the allegations in Clayton's complaint and the exhibit that Clayton attaches to her complaint. The exhibit shows that the Postal Service issued Clayton *eight* hours of LWOP and *sixteen* hours of AWOL rather than sixteen hours of LWOP and eight hours of AWOL. *See* doc. 103-1 at 48.

process her grievance, but someone from the office called the police on her. *Id.*

In September 2024, Clayton requested forty hours of vacation so that she could take off from work for a week in the middle of the month. Doc. 103 at 2–3; *see* doc. 103-1 at 46. The Postal Service denied Clayton's request and instead issued her forty hours of LWOP. Doc. 103 at 3. Apparently because of this denial, one of Clayton's September paychecks fell short of Clayton's usual paycheck by $1,442. *Id.*

Clayton argues that the Postal Service's repeated denials of her requests for vacation time amount to "ongoing retaliation." Doc. 103 at 2.

### B.    Procedural history

Clayton filed her first complaint on September 20, 2023. *See* doc. 1. In response, both the Postal Service and the Union filed motions to dismiss. Docs. 15, 22, 47, 51–52. The Court granted the Union's motion for partial dismissal and denied the Postal Service's motion as moot because Clayton failed to properly serve the Postal Service. Doc. 59 at 14. After Clayton's second attempt at service, the Postal Service filed another motion to dismiss, doc. 72, and a motion to substitute, doc. 75. The Court granted the motion to substitute, substituting Postmaster General Louis DeJoy as the proper defendant for Clayton's Title VII and Age Discrimination in Employment Act (ADEA) claims and the United States as the proper defendant for Clayton's libel claim. Doc. 82 at 1. The Court refers to the Postal Service, Tulino (*see supra* at 1 n.1) , and the United States collectively as "Federal Defendants."

After the Court granted the Motion to Substitute, but before the Court could rule on Federal Defendants' Motion to Dismiss, Clayton filed four motions to amend her complaint. *See* docs. 85, 92, 94, 95. The Court denied them all for failure to comply with the Local Rules regarding motions for leave to amend. Doc. 98. But, in the same order, the Court granted

Clayton leave to file a procedurally compliant amended complaint.  *Id.*  Clayton filed one.  *See* doc. 103; *see also* docs. 101, 102.

From what this Court can tell, Clayton's operative complaint lodges thirteen claims against Defendants:  (1) gender discrimination under Title VII; (2) age discrimination and retaliation; (3) harassment on the basis of protected characteristics; (4) retaliation under Title VII; (5) retaliation under the ADEA; (6) retaliation under the Fair Labor Standards Act (FLSA); (7) violation of the Equal Pay Act (EPA); (8) a hybrid claim under the Labor Management Relations Act (LMRA); (9) another ADEA violation; (10) religious discrimination; (11) libel; (12) violations of the Fourteenth and Fifth Amendments to the United States Constitution; and (13) another FLSA violation.  *See* doc. 103 at 1.

Clayton seeks damages for unpaid wages, back pay, emotional and mental distress, loss of sleep, and loss of enjoyment of life.  Doc. 103 at 24.  Additionally, she seeks $1 million for each of her counts[4] and punitive damages of $30 million.  *Id.*  Overall, she seeks about $75 million for "all damages."  *Id.*

## II.  Standards

### A.  Motions to dismiss

Federal Rule of Civil Procedure 12(b) allows a defendant to assert various defenses by motion:  "(1) lack of subject-matter jurisdiction; (2) lack of personal jurisdiction; (3) improper venue; (4) insufficient process; (5) insufficient service of process; (6) failure to state a claim upon which relief can be granted; and (7) failure to join a party under Rule 19."  As discussed

---

[4] In her prayer for relief, Clayton states that she has fourteen counts.  *See* doc. 103 at 24.  But when she enumerates her counts at the beginning of the operative complaint, Clayton strikes through one of the fourteen counts:  count 10. Doc. 103 at 1.  That's why the Court assumes that Clayton lodges thirteen claims, not fourteen.  *See* E.D. Mo. L.R. 4.07 (describing how, in an "amended pleading," material that is "struck through" is "material being removed" from the pleading).  Consequently, the Court refers to what Clayton labels as counts 11, 12, 13, and 14, doc. 103 at 1, as counts 10, 11, 12, and 13, respectively.

below, some of these defenses result in dismissal of various claims.

### 1.    Lack of subject-matter jurisdiction

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may move to dismiss for lack of subject-matter jurisdiction. The plaintiff bears the burden of establishing that subject-matter jurisdiction exists. *Herden v. United States*, 726 F.3d 1042, 1046 (8th Cir. 2013) (en banc). "Because of the unique nature of the jurisdictional question, it is the court's duty to decide the jurisdictional issue, not simply rule that there is or is not enough evidence to have a trial on the issue." *Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019) (cleaned up). "[T]he district court must distinguish between a facial attack—where it looks only to the face of the pleadings—and a factual attack—where it may consider matters outside the pleadings." *Croyle v. United States*, 908 F.3d 377, 380 (8th Cir. 2018) (citing *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990)).

Where, as here, a party brings a factual attack, "the court considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Davis v. Anthony, Inc.*, 886 F.3d 674, 679 (8th Cir. 2018) (quoting *Osborn*, 918 F.2d at 729 n.6). "[T]he court may receive evidence via 'any rational mode of inquiry,' and the parties may 'request an evidentiary hearing.'" *Buckler*, 919 F.3d at 1044 (quoting *Osborn*, 918 F.2d at 730). "[T]he party invoking federal jurisdiction must prove jurisdictional facts by a preponderance of the evidence." *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir. 2018) (citing *OnePoint Sols., LLC v. Borchert*, 486 F.3d 342, 347 (8th Cir. 2007)).

"[T]he court must rule upon the jurisdictional issue unless it is so bound up with the merits that a full trial on the merits may be necessary to resolve the issue." *Buckler*, 919 F.3d at 1044 (cleaned up). "If the jurisdictional issue is 'bound up' with the merits it remains within the

9

district court's discretion to decide whether to evaluate the evidence under the summary[-]judgment standard." *Moss*, 895 F.3d at 1097.  In sum, the Court may do the following on a factual attack:  (1) consider evidence outside the pleadings, such as affidavits or other documents; (2) hold an evidentiary hearing; (3) evaluate the evidence under the summary[-]judgment standard; or even (4) proceed to a full trial.  *See id.*; *see also Buckler*, 919 F.3d at 1044.  As discussed below, the Court decides Federal Defendants' Motion to Dismiss, doc. 106, by considering the submitted evidence.

### 2.    Failure to state a claim

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted."  The notice pleading standard of Rule 8(a)(2) requires a plaintiff to give "a short and plain statement showing that the pleader is entitled to relief."  To meet this standard and to survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citation omitted).  This requirement of facial plausibility means the factual content of the plaintiff's allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018) (quoting *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012)).  The Court must grant all reasonable inferences in favor of the nonmoving party.  *Lustgraaf v. Behrens*, 619 F.3d 867, 872–73 (8th Cir. 2010).  Ordinarily, a court considers only the facts alleged in the complaint for purposes of a motion to dismiss; however, a court may also consider materials attached to the complaint may in construing the complaint's sufficiency.  *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011).

When ruling on a motion to dismiss, a court "must liberally construe a complaint in favor of the plaintiff." *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010).  However, if a claim fails to allege one of the elements necessary to recover on a legal theory, the Court must dismiss that claim for failure to state a claim upon which relief can be granted.  *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 355 (8th Cir. 2011).  Threadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  Although courts must accept all factual allegations as true, they are not bound to take as true a legal conclusion couched as a factual allegation. *Twombly*, 550 U.S. at 555 (internal quotations and citation omitted); *Iqbal*, 556 U.S. at 677–78.

### 3.    *Pro se* complaint

The Court liberally construes complaints filed by laypeople.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  "Liberal construction" means that "if the essence of an allegation is discernible," the Court should "construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework."  *Solomon v. Petray*, 795 F.3d 777, 787 (8th Cir. 2015) (quoting *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004)).

### B.    Motions for summary judgment

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to

11

judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(a).

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted) (quoting Fed. R. Civ. P. 56(e)).  Self-serving, conclusory statements without support are insufficient to defeat summary judgment.  *Armour & Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"A defendant may move for summary judgment 'at any time,' and the rules do not require that discovery be completed before the motion is heard."  *Alhom v. Am. S.S. Co.*, 144 F.3d 1172, 1177 (8th Cir. 1998).  "A defending party is not required by the rule to file an answer before moving for summary judgment."  10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2718 (4th ed. 2024) (collecting cases).  The trial court has "discretion" in determining whether a motion for summary judgment is "premature because the issues need further development."  *Id.*

## III.    Discussion

### A.    Preliminary motions

Clayton filed surreply briefs to Federal Defendants' and the Union's dispositive motions. *See* docs. 127, 130.  Federal Defendants and the Union move to strike the surreplies.  *See* docs. 128, 131.

12

The Local Rules allow only three memoranda for each motion: (1) a memorandum in support of the motion, (2) a memorandum in opposition to the motion, and (3) a reply memorandum. *See* E.D. Mo. L.R. 4.01. "Additional memoranda may be filed by either party only with leave of Court." E.D. Mo. L.R. 4.01(C). "While the Court has discretion to permit a sur-reply where justice so requires, it does not allow them as a matter of course. In particular, a '[sur-reply] is unwarranted where the reply responds to the arguments in the [response brief] and does not raise new arguments.'" *Johnson v. City of Leadington*, No. 4:19-cv-02282-SEP, 2022 WL 179218, at \*10 (E.D. Mo. Jan. 20, 2022) (citations omitted).

Here, the Court finds the surreplies "unwarranted." *Id.* (citation omitted). Thus, the Court grants Federal Defendants' and the Union's motions to strike, docs. 128, 131.

### B. Federal Defendants' motions to dismiss and motions for summary judgment

Federal Defendants move to dismiss Clayton's operative complaint. Doc. 106, 114. In the alternative, Federal Defendants move for summary judgment. *Id.* The Court considers each of Federal Defendants' grounds for dismissal, or for summary judgment, in turn.

#### 1. Lack of subject-matter jurisdiction

Federal Defendants argue that the Court should dismiss some of the ADEA claims (counts 2, 3, 5, 9), the EPA claim (count 7), the libel claim (count 11), and the Fifth Amendment claim (count 12) for lack of subject-matter jurisdiction. Doc. 114 at 10–11, 24–25.

##### a. ADEA claims

Clayton explicitly labels counts 2, 5, and 9 as ADEA claims. *See* doc. 103 at 1. But she fails to clearly distinguish between Title VII and the ADEA for count 3, *see id.* at 9 (complaining that the Postal Service "failed to address older, black religious, woman complaints of

harassment" for count 3).  To the extent that Clayton complains of age discrimination in count 3, the Court construes count 3 as an ADEA claim.

Federal Defendants argue that the Court should dismiss Clayton's ADEA claims accruing before September 2, 2022, for want of subject-matter jurisdiction.  Doc. 114 at 15.  The Court agrees.

The ADEA provides that an individual may not commence a civil action "until the individual has given the [Equal Employment Opportunity] Commission not less than thirty days' notice of an intent to file such action."  29 U.S.C. § 633a(d).  And "[s]uch notice shall be filed within one hundred and eighty days after the alleged unlawful practice occurred."  *Id.*  Here, Clayton filed her notice of intent to sue for age discrimination on March 1, 2023.  Doc. 106-20 at 3–4.  Thus, any claim that arose before September 2, 2022 falls outside the Court's jurisdiction.

Clayton appears to respond to this argument by denying that the one-hundred-and-eighty-day provision exists.  *See* doc. 118 at 6 ("There is not [a] 180-day accrual requirement or limitation on ADEA claims.").  But the statutory language disproves Clayton's argument.  *See* 29 U.S.C. § 633a(d).  Thus, the Court dismisses the pre-September 2, 2022 claims for lack of subject-matter jurisdiction.

### b.    EPA claim (count 7)

The Postal Service argues that the Court should dismiss Clayton's EPA claim because the Tucker Act strips this Court of subject-matter jurisdiction.  Doc. 114 at 10–11.  The Court disagrees.

The EPA, 29 U.S.C. § 206(d), amended the FLSA, 29 U.S.C. §§ 201–219.  *Corning Glass Works v. Brennan*, 417 U.S. 188, 190 (1974).  Under 29 U.S.C. § 216(b), the FLSA provides a private cause of action for EPA violations.  Although the Tucker Act gives the United

States Court of Federal Claims exclusive jurisdiction "to render judgment upon any claim *against the United States* founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort," 28 U.S.C. § 1491(a)(1) (emphasis added), "the Tucker Act does not apply" to the Postal Service because "[t]he Postal Service is a legal entity separate from the United States itself," *Cont'l Cablevision of St. Paul, Inc. v. U.S. Postal Serv.*, 945 F.2d 1434, 1440 (8th Cir. 1991). Since the Postal Service remains the defendant for the EPA claim, the Tucker Act doesn't strip this Court of jurisdiction to hear that claim.

### c.       Libel claim (count 11)

Clayton brings a libel claim against the United States for "print[ing] false statements about [her] that put [her] in a false light, caused [her] harm, inflicted financial emotional distress [and] ruined [her] reputation." Doc. 103 at 20. In response, the United States argues that the Court should dismiss this claim for lack of subject-matter jurisdiction. Doc. 114 at 24–25. The Court agrees.

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (citations omitted). And sovereign immunity impacts jurisdiction. *Id.* "Indeed, the 'terms of the United States' consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *Id.* (cleaned up) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). While the Federal Torts Claims Act provides a waiver, allowing a party to sue the United States for the "negligent or wrongful act or omission of any employee of the Government," 28 U.S.C. § 1346(b)(1), Congress specifically exempts libel from such a suit, 28 U.S.C. § 2680(h). Because the United States has not waived

sovereign immunity for libel claims, this Court lacks jurisdiction to hear Clayton's libel claim against the United States.  Thus, the Court dismisses count 11 for lack of subject-matter jurisdiction.

### d.      Fifth Amendment claim (count 12)

Clayton argues that the Postal Service violated her Fifth Amendment rights and accordingly seeks damages.  Doc. 103 at 1–2, 24.  The Postal Service argues that sovereign immunity bars this claim, just like it bars the libel claim.  Doc. 114 at 25.  Because the Court cannot find a waiver for damages actions against federal agencies for procedural-due-process violations, nor does Clayton identify one, *see* doc. 118, the Court agrees that subject-matter jurisdiction doesn't exist for this claim.  Thus, the Court dismisses the Fifth Amendment claim for lack of subject-matter jurisdiction.

### 2.      Failure to exhaust administrative remedies

Clayton brings counts 1, 3, 4, and 10 under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.  *See generally* doc. 103.  While Clayton explicitly labels counts 1 and 4 as Title VII claims, *see id.* at 1, 6, 8, she fails to clearly distinguish between Title VII and the ADEA for count 3, *see id.* at 9 (complaining that the Postal Service "failed to address older, black religious, woman complaints of harassment" for count 3).  And Clayton merely labels count 10 "Religion" without further explaining the legal theory behind the count.  *Id.* at 1.  To the extent that Clayton complains of racial and religious discrimination for counts 3 and 10, the Court construes those counts as a Title VII claims.

For Clayton's Title VII claims, Tulino argues that Clayton failed to exhaust her administrative remedies and that the Court should dismiss the claims for this reason.  Doc. 114 at 26.  As discussed below, the Title VII exhaustion requirement does bar Clayton from bringing

her claims.  *See Fort Bend Cnty., Tex. v. Davis*, 587 U.S. 541, 551 (2019) (holding that "Title VII's charge-filing requirement is a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of courts").

Section 2000e-16 governs federal employment, and the provision limits a federal employee's ability to bring a civil action against her employer.  Specifically, "[b]efore a federal civil servant can sue [her] employer in court for discriminating against [her] in violation of Title VII, [she] must first exhaust [her] administrative remedies."  *Green v. Brennan*, 578 U.S. 547, 552–53 (2016) (citing 42 U.S.C. § 2000e–16(c)); *see also Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 851 (8th Cir. 2012) (affirming a district court's decision to grant a motion to dismiss for failure to exhaust administrative remedies).   Because of this requirement, the Eastern District of Missouri's Employment Discrimination Complaint form notes:  "*In order to bring suit in federal district court under Title VII, you must first obtain a right-to-sue letter from the Equal Employment Opportunity Commission.*"  Doc. 1 at 1 (emphasis in original).

But here, on the court-provided form in her original complaint, Clayton stated that she had not received a notice of a right-to-sue letter.  *Id.* at 4.  Further, Clayton fails to allege, in her operative complaint, that she received notice of a right-to-sue letter.  Considering the operative complaint, the Court finds that Clayton has failed to make any well-pleaded allegation that she exhausted her administrative remedies, and the Court therefore dismisses, without prejudice, her Title VII claims.  Thus, the Court dismisses counts 1 and 4.  And the Court dismisses any complaints of racial or religious discrimination under counts 3 and 10.

### 3.    Failure to state a claim and Motion for Summary Judgment

Federal Defendants argue that the Court should dismiss the EPA claim and the remaining claims for failure to state a claim.  *See* doc. 114.  In the alternative, Federal Defendants move for summary judgment.  *See id.*  The Court goes through each claim below.

### a.    ADEA claims (counts 2, 3, 5, and 9)

Under theories of disparate treatment, hostile work environment, and retaliation, Clayton argues that Federal Defendants violated her ADEA rights.  *See* doc. 103.

### i.    Disparate treatment

On account of the Court's prior dismissal of some of Clayton's ADEA claims for lack of subject-matter jurisdiction, *see supra* section III.B.1, the only remaining disparate-treatment claim that this Court can find is the claim that the Postal Service's disparate suspensions of Clayton and Spain amounted to age discrimination.  *See generally* doc. 103.

The ADEA provides that "[a]ll personnel actions affecting employees . . . who are at least 40 years of age . . . in the United States Postal Service . . . shall be made free from any discrimination based on age."  29 U.S.C. § 633a(a).  To survive a motion for summary judgment, Clayton must first make out a prima facie claim of age discrimination by establishing that "(1) she was at least forty years old, (2) she was meeting her employer's legitimate performance expectations, (3) she suffered an adverse employment action, and (4) similarly[] situated employees outside the class were treated more favorably."  *Thomas v. Corwin*, 483 F.3d 516, 528 (8th Cir. 2007).  If Clayton satisfies her initial burden, then the burden shifts to Federal Defendants "to articulate a legitimate, nondiscriminatory reason for their actions."  *Id.*  If Federal Defendants satisfy that burden, then the burden shifts back to Clayton to show a genuine issue of

material fact that Federal Defendants' stated reason for the action was pretextual.  *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)).

Here, even assuming (without deciding) that Clayton can establish a prima facie case of age discrimination, Federal Defendants have articulated a legitimate, nondiscriminatory reason for Clayton's and Spain's disparate suspensions:  that both Spain and Cameron provided statements to the Postal Police that Clayton had stated to coworkers that Clayton carried a knife on her for Spain and Cameron.  *See* doc. 107 at ¶¶ 71–72.  And Clayton cannot establish a fact issue about whether this reason amounted to pretext.  "[P]roof that the [employer's] explanation is false is necessary, but not sufficient, to show a pretext for discrimination under the ADEA" and avoid summary judgment.  *Tusing v. Des Moines Indep. Comm. Sch. Dist.*, 639 F.3d 507, 516 (8th Cir. 2011).  "In other words, the plaintiff must show that the employer's stated reason was false and that age discrimination was the real reason."  *Id.*

Here, Clayton "has presented no evidence showing" that the Postal Service's articulated reason was false, and much less has she presented any evidence that age discrimination motivated the disparate suspensions.  *Id.*  Although Clayton vigorously contests the underlying allegation that she carried a knife or threatened her coworkers, *see generally* doc. 117, she fails to contest (and even admits in her response to Federal Defendants' Statement of Uncontroverted Material Facts) that Spain reported to the Postal Service that Clayton pulled a knife on Spain and that Cameron also "volunteered a statement" that Clayton had threatened another employee.  Doc. 117 at ¶¶ 71–72.  Thus, the Court finds as undisputed, for summary-judgment purposes, that both Spain and Cameron reported to the Postal Service that Clayton had threatened her coworkers.

19

In other words, Clayton admits that she cannot show pretext. *See Tusing*, 639 F.3d at 516 (affirming summary judgment where the plaintiff "presented no evidence that the [employer's] stated reason for [the alleged disparate treatment] was false"); *see also Richey v. City of Indep.*, 540 F.3d 779, 784 (8th Cir. 2008) (affirming summary judgment and holding that a plaintiff could not satisfy the *McDonnell Douglas* framework in a Missouri Human Rights Act case because he failed to "show a genuine issue of fact about whether the employer acted based on an intent to retaliate rather than on a good faith belief that the employee violated a workplace rule").

Thus, the Court grants Federal Defendants' Motion for Summary Judgment on the ADEA disparate-treatment claim.

### ii.      Hostile work environment

Clayton alleges that the Postal Service subjected her to a hostile work environment by subjecting her to constant harassment and abuse based on her age. Doc. 103 at 9. To establish an ADEA hostile-work-environment claim, Clayton must establish that: (1) she belongs to a protected group, (2) she experienced unwelcome harassment based on her age, (3) the harassment affected a term, condition, or privilege of her employment, (4) her employer knew or should have known of the harassment, and (5) the employer failed to take proper action. *See Peterson v. Scott Cnty.*, 406 F.3d 515, 523–24 (8th Cir. 2005), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) (en banc).

Though the uncontroverted facts establish that Clayton is 60 years old, *see* doc. 117 at ¶ 1, Clayton fails to establish the other elements. Most notably, Clayton fails to point to any evidence that any of Spain's or Cameron's behavior affected a term, condition, or privilege of Clayton's employment. The only evidence that Clayton has pointed to are her own statements that Spain and Cameron cursed at her and occasionally called her "old." *See* doc. 107 at ¶¶ 69–

20

70, 106; doc. 117 at ¶¶ 69–70, 106.  Viewing the evidence in the light most favorable to Clayton, the Court assumes the truth of these statements for summary-judgment purposes.  *See Agristor*, 826 F.2d at 734 (holding that, on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party).  But that does not suffice to show a genuine dispute of material fact that Spain's and Cameron's behaviors affected any terms, conditions, or privileges of Clayton's employment.  *See Rickard v. Swedish Match N. Am., Inc.*, 773 F.3d 181, 184 (8th Cir. 2014) (holding that allegations of "simple teasing" or "offhand comments" do not suffice to overcome summary judgment).

### iii.    Retaliation

Clayton alleges that the Postal Service retaliated against her for complaining about ADEA violations when the Postal Service suspended her after her quarrels with Spain.  *See* doc. 103 at 9.  In response, Federal Defendants argue that Clayton cannot establish ADEA retaliation. Doc. 114 at 23.  The Court agrees with Federal Defendants.

"Without direct evidence of a retaliatory motive, [the Court] analyzes retaliation claims (whether under Title VII, the ADA, or the ADEA), under the burden-shifting framework of *McDonnell Douglas* . . . ."  *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042–43 (8th Cir. 2007).  To establish a prima facie case of retaliation, Clayton must establish that: (1) she participated in a protected activity, (2) the Postal Service took an adverse employment action against her, and (3) a causal relationship existed between the participation in the protected activity and the adverse employment action.  *See Trammel v. Simmons First Bank of Searcy*, 345 F.3d 611, 615 (8th Cir. 2003).  To satisfy the first element based on her complaints, Clayton must establish that she complained of "conduct that the ADEA protects," i.e., "age discrimination."  *Id.*

Here, the evidence in the record falls short of establishing a prima facie case of retaliation.  First, out of the many grievances and complaints that Clayton attaches to her operative complaint, the Court can find only three that relate to age discrimination.  *See* doc. 103-1 at 27 (complaining, in July 2022, that the Postal Service "treats its younger women co-workers more favorably); *id.* at 29 (complaining, in July 2022, that a supervisor "treats younger co-worker Mercedes Spain more favorably"); *id.* at 34 (complaining, in October 2022, that Clayton's "younger co-worker [Spain] is allowed to work [overtime] in the manual unit").[5]  Her other complaints, which don't relate to age discrimination, don't qualify as protected activity.  *See Trammel*, 345 F.3d at 615.  Thus, the Court finds as undisputed, for summary-judgment purposes, that Clayton engaged in protected activity only on these three occasions.  *See* Fed. R. Civ. P. 56(c)(1)(A) (providing that a party asserting the presence of a genuinely disputed fact must cite "to particular parts of materials in the record" to support that assertion).

Clayton fails to show a causal relationship between these complaints and the alleged retaliatory discipline.  The complaints came between two and six months before Clayton faced any discipline for her quarrels with Spain.  "The inference [of causation] vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months."  *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011).  From the evidence in the record—not merely Clayton's conclusory arguments of "retaliation," *see, e.g.*, doc. 118 at 8—the Court cannot infer discrimination.  *See Tyler*, 628 F.3d at 986.  And, aside from the mere passage of time and these conclusory arguments of "retaliation," Clayton

---

[5] The Court, liberally construing Clayton's filings, includes the attachments to Clayton's complaint as part of the record for summary-judgment purposes.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (holding that courts must liberally construe documents filed pro se (citing *Estelle*, 429 U.S. at 106)).

has failed to point to any evidence of causation in the record.  Thus, the Court finds as undisputed, for summary-judgment purposes, that no causal relationship existed between the protected activity and the alleged retaliation.  That spells doom for her retaliation claims.  *See, e.g.*, *id.*

Clayton's claim that her 2024 wage issues amounted to "retaliation," *see* doc. 103 at 3 suffers from the same defects because Clayton has pointed to no evidence that she engaged in protected activity within a temporal proximity of these issues, nor has she pointed to any other evidence of retaliation.  *See generally* doc. 117.

Thus, the Court grants Federal Defendants' Motion for Summary Judgment on Clayton's ADEA claims.

### b.    EPA claims (counts 6 and 7)

Clayton argues that the Postal Service violated the Equal Pay Act and then retaliated against her for complaining about EPA violations.  *See* doc. 103 at 1; *see generally* doc. 103.  The Court takes up each point in turn.

### i.    EPA violation based on schedule change

Clayton bases her EPA claim on the fact that the 2022 schedule change deprived Clayton of half of her Sunday premium wages while it didn't deprive Cameron, a male employee, of half of *his* Sunday premium wages.  *Id.* at 19.  Clayton admits, though, that the schedule change made it so that Clayton and Cameron received an *equal* amount of Sunday premium wages.  Doc. 119 at 3.  But Clayton argues that the Postal Service's decision to *reduce* Clayton's premium hours to match Cameron's hours, rather than to *increase* Cameron's premium hours to match Clayton's, violated the EPA.  *Id.*

The EPA provides the following:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex:  Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1).  Notably, the statute prohibits an employer from "reduc[ing] the wage rate of any employee" *only* if the employer "is paying a wage rate differential in violation of" the EPA.  *Id.*  But here, Clayton admits that the pre-schedule-change difference between Clayton's and Cameron's Sunday hours had nothing to do with sex.  Indeed, Clayton admits that she received 16 hours of Sunday premium pay before the schedule change because she had "won a bid" for a shift that paid 16 hours of Sunday premium pay.  Doc. 117 at ¶¶ 5–7.  In contrast, Clayton admits, Cameron worked fewer Sunday premium hours because he "selected a schedule that doesn't include Saturday and Sunday premium pay."  *Id.* at ¶ 105.  Thus, the pre-schedule-change differential in Sunday hours was attributable to a combination of Clayton's good fortune and Cameron's unwillingness to work Sunday premium hours, i.e., "factor[s] other than sex."  29 U.S.C. § 206(d)(1).  The Postal Service was thus not "in violation of" the EPA before the schedule change and, thus, was not prohibited from reducing the wage rate of an employee.  *Id.*

### ii.    EPA retaliation

Clayton argues that the Postal Service retaliated against her for her complaints about the schedule change by:  (1) imposing the schedule change, (2) issuing her the pre-disciplinary

interview, (3) denying her overtime work, and (4) issuing her the letter of warning.  Doc. 103 at 16–20.

To survive a motion for summary judgment on EPA retaliation without direct evidence of retaliation, Clayton must establish that she participated in a statutorily protected activity, that the Postal Service took an adverse employment action against her, and that a causal connection existed between the activity and the adverse action.  *See Yearns v. Koss Constr. Co.*, 964 F.3d 671, 674–75 (8th Cir. 2020).  If Clayton can establish that, then the burden shifts to the Postal Service to "articulate legitimate, non-retaliatory reasons for the [adverse employment action]." *Id.* at 675.  If the Postal Service can do that, then the burden shifts back to Clayton to show that the so-called legitimate reasons for the adverse employment action were pretextual.  *See id.*

On her first argument, Clayton cannot establish causation.  "[A]lleged retaliation [that] precedes protected conduct cannot logically be used to show causation."  *Stewart*, 481 F.3d at 1044 (8th Cir. 2007).  Here, Clayton admits that she filed a grievance regarding the schedule change on September 18, 2022, a day *after* the Postal Service notified Clayton that her schedule would change.  *See* doc. 117 at ¶¶ 11, 16.  Since Clayton admits that she did not file the grievance until a day after the schedule change, the Court finds that timeline undisputed for summary-judgment purposes.  *See id.*  The Postal Service couldn't have, by imposing the schedule change, retaliated against Clayton for complaining about the Postal Service's prior decision to impose the *very same* schedule change.

Clayton's second and fourth arguments suffer from incurable defects, too.  First, Clayton does not even attempt to demonstrate that the pre-disciplinary interview or the letter of warning amount to adverse employment actions.  *See Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1131 (8th Cir. 2014) (holding that "[a]n adverse employment action is a tangible change in

working conditions that produces a material employment disadvantage" (quoting *Wilkie v. Dep't of Health & Hum. Servs.*, 638 F.3d 944, 955 (8th Cir. 2011)).  Second, even assuming that these actions amount to adverse employment actions, Clayton cannot show that her participation in a protected activity caused the Postal Service's actions because Clayton largely bases her retaliation theory on her decision not to work the schedule change, which doesn't amount to an EPA protected activity.  *See Yearns*, 964 F.3d at 674 (defining protected activity to include "fil[ing] any complaint or institut[ing] or caus[ing] to be instituted any proceeding under or related to" the EPA (quoting 29 U.S.C. § 215(a)(3)).  Finally, even assuming that Clayton *could* satisfy her initial burden, her own admissions prove that she cannot overcome the burden of showing that the Postal Service's stated reason for issuing the letter of warning was mere pretext.  Specifically, Clayton didn't show up for work at scheduled times, a fact that Clayton admits*, see* doc. 103-1 at 18–20 (*see supra*, at 22 n.5).  And Clayton *admits* that she didn't show up for work at the times that the Post Office listed as times where Clayton didn't show up for work, *see* doc. 117 at ¶ 30.  Thus, the Court finds these facts undisputed for summary-judgment purposes, and those very same facts conclusively establish that Clayton cannot demonstrate pretext.

As for the third argument, the undisputed facts in the record refute Clayton's argument that she was even denied overtime work, and much less that such a nonexistent denial amounted to retaliation.  Federal Defendants have provided evidence of Clayton's clock rings, which indicate that the Postal Service paid Clayton for dozens of overtime hours in the time periods at issue, apparently because the Postal Service logged Clayton's post-schedule-change worked Sunday hours that Clayton was not supposed to work as overtime hours.  *See* doc. 107 at ¶¶ 37–40; doc. 117 at ¶¶ 37–40.  Clayton responds to this evidence by baselessly asserting that the Postal Service "edited and altered [her] paycheck stubs."  Doc. 117 at ¶ 39.  This assertion does

not suffice to defeat summary judgment, and the Court finds as undisputed, for summary-judgment purposes, that the Postal Service counted the Sunday hours that Clayton worked after her schedule change as overtime hours.  *See Matsushita*, 475 U.S. at 587 (holding that a party opposing summary judgment must "come forward with 'specific facts showing that there is a genuine issue for trial'" (quoting Fed. R. Civ. P. 56(e)); *Armour & Co.*, 2 F.3d at 279 (holding that "conclusory statements without support are insufficient to defeat summary judgment" (citation omitted)).  This same evidence also dispatches Clayton's allegations that the Postal Service failed to pay Clayton her wages, an allegation that Clayton appears to make throughout the operative complaint but for which she fails to provide factual or legal context.  *See generally* doc. 103.

No amount of discovery can change the fate of Clayton's EPA claims, so the Court finds summary judgment proper, even at this stage.  Given that Clayton, based on the uncontested facts in the record and Clayton's own admissions, cannot establish an EPA violation or EPA retaliation, the Court grants Federal Defendants' Motion for Summary Judgment on these claims.

### c.    Hybrid claim against the Postal Service and the Union (count 8)

Clayton appears to bring a claim against the Postal Service and the Union for breach of the collective-bargaining agreement.  *See* doc. 103 at 1 (labeling count 8 as "Sec.301 29 U.S.C. 158(a)").  Section 301 of the LMRA is codified at 29 U.S.C. § 185, not 29 U.S.C. § 158.  *See* 29 U.S.C. § 185.  And section 158(a), which deals with unfair labor practices, does not appear to have any connection to Clayton's allegations.  Thus, the Court *would* assume that Clayton seeks to bring a hybrid claim under 29 U.S.C. § 185.  "A hybrid claim 'combines a straightforward § 301 breach-of-contract suit against an employer with a suit against the union for breach of the union's duty of fair representation.'"  *Clayton v. DeJoy*, No. 4:18-cv-01039-JAR, 2020 WL

27

6822641, at *2 n.6 (E.D. Mo. Nov. 20, 2020) (quoting *Livingstone v. Schuck Market, Inc.*, 950 F.2d 579, 581 (8th Cir. 1991)), *aff'd*, 854 F. App'x 772 (8th Cir. 2021).  But, as the Postal Service correctly points out, *see* doc. 114 at 32 n.9, the Postal Service "is not an 'employer' as defined under the LMRA."  *Clayton*, 2020 WL 6822641, at *2 n.6 (citing 29 U.S.C. §§ 152(a)(2), 471.4(a)(1)).  "Construing the complaint liberally, however, the Court takes notice that 39 U.S.C. § 1208(b) is identical to 29 U.S.C. § 185 in all relevant respects but applies to USPS employees." *Id.*  Thus, the Court construes Clayton's claim as a hybrid claim under 39 U.S.C. section 1208(b).  *See id.*

"To recover against an employer or union for breach of a collectively bargained agreement under a hybrid claim, 'employees must first prove that their union breached its duty of fair representation.'"  *Id.* (quoting *Barlow v. Am. Nat'l Can Co.*, 173 F.3d 640, 642 (8th Cir. 1999)).  "'[T]he two claims are inextricably interdependent,' and to 'prevail against either the company or the Union, . . . [employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union.'"  *Id.* (alterations in original) (quoting *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164–65 (1983)).  "The takeaway from this extensive background is that [Clayton] must demonstrate a breach of the duty of fair representation in order to make any hybrid claim against [the Postal Service] or [the Union]." *Id.*

To show the existence of the breach of the collective-bargaining agreement, as with any other breach-of-contract claim, a plaintiff must establish four things:  "(1) a contract between the plaintiff and defendant; (2) rights of the plaintiff and obligations of the defendant under the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Erler v. Graham Packaging*, No. 4:14-cv-931-JCH, 2014 WL 6463338, at *3 (E.D. Mo. Nov. 17,

28

2014) (citation omitted).  Additionally, "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective[-]bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190 (1967); *see also Clayton*, 2020 WL 6822641, at *14–18 (relying on *Vaca* to grant summary judgment).  And an individual employee has no "absolute right to have [her] grievance taken to arbitration regardless of the provisions of the applicable collective[-]bargaining agreement." *Id.* at 191.

Clayton's claim arises out of the Union's settlement of three of her grievances without her consent.  *See* doc. 103.  One settlement took place in January 2023, *see id.* at 23; doc. 103-1 at 26, while the other two took place in August 2023, *see* doc. 103 at 20; doc. 103-1 at 24–25. The Court previously dismissed as untimely, with prejudice, the duty-of-fair-representation claim as to the Union for the claim regarding the January 2023 settlement.  *See* doc. 59 at 13 (concluding that "[w]hen the [U]nion settled the grievance, Clayton knew, or reasonably should have known, that the [U]nion allegedly breached its duty of fair representation" and holding that Clayton "needed to bring a claim by July 2023").  This causes Clayton's claim regarding the January 2023 settlement as to the Postal Service to fail, too.  *See Warren v. Metro Transit*, No. 4:20-cv-00781-SRC, 2021 WL 124315, at *5 (E.D. Mo. Jan. 13, 2021).  Thus, the Court dismisses that claim with prejudice.

Clayton argues that the parties breached the collective-bargaining agreement in two ways:  first, because the parties took more than six months to settle her grievances, and second, because the Union settled the grievances without Clayton's consent.  *See* doc. 103 at 20.  In either case, as the Court discusses below, Clayton's claim, to the extent that she has stated one, fails to withstand the Postal Service's Motion for Summary Judgment.

29

i.        **Failure to resolve the grievances within 6 months**

On this point, Clayton has failed to show a genuine, material issue of disputed fact on two essential elements of her claim that the parties even breached the collective-bargaining agreement, much less that the Union breached its duty of fair representation.  First, Clayton admits that the collective-bargaining agreement stated only that the parties agreed to "aim" to resolve grievances within six months, not that the parties had an *obligation* to resolve them within that timeframe.  Doc. 118 at 10.  Thus, the Court finds as undisputed, for summary-judgment purposes, that the collective-bargaining agreement contained no requirement that the Union resolve Clayton's grievances within six months.  And, axiomatically, *that* means that Clayton cannot show that the Union breached the collective-bargaining agreement in the way that Clayton alleges that it did, which means that Clayton has failed to show a genuine issue of material fact on an essential element of her claim.  It's not necessary to give Clayton more time for discovery on this point, either, because it is clear that she already has access to the collective-bargaining agreement, *see* doc. 119-1 at 1 (attaching a portion of the collective-bargaining agreement to her response brief), so summary judgment is proper for any claims arising from these allegations.

Second, Clayton fails to show a genuine dispute of material fact regarding any damages that she suffered *because the parties did not resolve her grievances within six months*.  *See generally* docs. 103, 117, 118, 119.  Thus, the Court finds as undisputed, for summary-judgment purposes, that Clayton did not suffer damages on this claim.  These two elements are essential to Clayton's claim that the parties breached the collective-bargaining agreement.  *See, e.g.*, *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 569–70 (1990) (holding that a section 301 claim "is comparable to a breach of contract claim—a legal issue");

30

*Clayton*, 2020 WL 6822641, at *2 n.6 (explaining that [a] hybrid claim 'combines a straightforward § 301 breach-of-contract suit against an employer with a suit against the union for breach of the union's duty of fair representation"); *Al-Khaldiya Electronics & Electrical Equip. Co. v. Boeing Co.*, 571 F.3d 754, 758 (8th Cir. 2009) (holding that "[s]ummary judgment is appropriate where there is no evidence that the plaintiff was damaged by a breach of contract" (citation omitted)).  Thus, the Court grants Federal Defendants' Motion for Summary Judgment as to this claim.

### ii.     Settling grievances without Clayton's consent

Clayton also fails to allege, let alone to show a genuine dispute of material fact, that the Union's conduct in settling the grievances was "arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190.  On the contrary, from the record that Federal Defendants have provided (and that Clayton has failed to meaningfully contest), the settlement appears to be reasonable and even favorable to Clayton. *See, e.g.*, doc. 107 at ¶¶ 92–95 (demonstrating that the settlement that the parties reached regarding one of Clayton's grievances would give Clayton all of the "relevant back pay" as long as Clayton cooperates with the back-pay process and that the Postal Service would restore *all* of the LWOP hours that Clayton lost from January 8, 2023, through February 5, 2023, essentially putting Clayton on par with Spain with respect to their discipline for the December 2022 quarrel); doc. 117 at ¶¶ 92–95 (failing to show an issue of material fact regarding this evidence).  Thus, the Court finds as undisputed, for summary-judgment purposes, that the settlement would have given Clayton all of the relevant back pay and restored all of Clayton's LWOP hours lost from January 8, 2023, through February 5, 2023.  And given that Clayton has failed to produce any extrinsic evidence, or even to make a well-pleaded allegation, that these settlements arose from decisions that were "arbitrary, discriminatory, or in bad faith,"

*Vaca*, 386 U.S. at 190, the Court finds as undisputed that they did not.  Thus, Clayton's putative

claim cannot survive summary judgment.  Thus, the Court grants the Postal Service's motion as

to this count.

### d.       Fourteenth Amendment claim (count 12)

Clayton argues that the Postal Service violated her Fourteenth Amendment rights.  *See*

doc. 103 at 1.  The Postal Service argues that the Court should dismiss this claim because the

Fourteenth Amendment applies only to the states, not to the federal government.  Doc. 114 at 25.

The Court agrees that the Fourteenth Amendment doesn't apply to the Postal Service.  *See*

*Warren v. Gov't Nat'l Mortg. Ass'n*, 611 F.2d 1229, 1232 (8th Cir. 1980) (drawing a distinction

between the Fifth Amendment, which applies to the federal government, and the Fourteenth

Amendment, which applies to the states).  Thus, the Court dismisses, with prejudice, Clayton's

Fourteenth Amendment claim.

### e.       FLSA recordkeeping claim (count 13)[6]

Clayton argues that the Postal Service violated the FLSA's recordkeeping provisions.

*See* doc. 103 at 19 (arguing that the Postal Services "reported false information" and failed to

maintain "accurate employee records" (emphasis omitted)).  The Postal Service argues that the

Court should dismiss this claim because "there is no private cause of action for violating the

FLSA's recordkeeping requirements."  Doc. 78 at 25 (quoting *Buck v. Lindsey Mgmt. Co.*, No.

4:13-cv-000676-KGB, 2014 WL 3446779, at *5 (E.D. Ark. July 15, 2014)).  The Court agrees

with the Postal Service.

---

[6] Federal Defendants did not address this claim in their memorandum in support of their motion to dismiss the
operative complaint.  *See generally* doc. 114.  But they did address it in their memorandum in support of their
motion to dismiss Clayton's original complaint.  *See* doc. 78 at 25.  "[D]efendants should not be required to file a
new motion to dismiss simply because an amended pleading was introduced while their motion was pending.  If
some of the defects raised in the original motion remain in the new pleading, the court simply may consider the
motion as being addressed to the amended pleading.  To hold otherwise would be to exalt form over substance."  6
Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1476 (3d ed. 2024) (collecting cases).

Under 29 U.S.C. § 211(c), covered employers must "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him." And, under 29 U.S.C. § 211(a), "the Administrator shall bring all actions under section 217 of this title to restrain violations of this chapter." Further, while section 216 provides employees with a private right of action for violations of sections 203(m)(2)(B), 206, 207, 215(a)(3), and 218(d), it does not provide one for violations of section 211. *See* 29 U.S.C. § 216(b).

Accordingly, federal courts have determined that section 211(c) does not provide a private cause of action. *See, e.g.*, *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 843 (6th Cir. 2002) ("Authority to enforce the Act's recordkeeping provisions is vested exclusively in the Secretary of Labor."); *Helmert v. Butterball, LLC*, 805 F. Supp. 2d 655, 668 n.15 (E.D. Ark. 2011) ("Even if [the defendant] were in violation of the FLSA's recording requirement for failing to record actual hours worked, the plaintiffs would not be entitled to damages because the FLSA does not provide a private cause of action for violations of the recording requirements."); *Skiba v. Timothy*, No. 4:20-CV-02656, 2023 WL 6725737, at *2 n.3 (S.D. Tex. Oct. 12, 2023) ("Although employers are required to maintain certain employee records, the FLSA and its corresponding regulations do not provide for a cause of action when employers fail to adhere to this requirement.").

Considering the statutory language, the Court finds these cases persuasive. Section 211(a) provides the "Administrator" with authority to enforce recordkeeping violations, and section 216(b) does not provide a private cause of action for recordkeeping violations. Thus, Clayton's recordkeeping claim fails, and the Court dismisses, with prejudice, count 13.

33

### f.       Any remaining claims

Clayton's complaint lacks organization, and Clayton fails to provide context for many, if not most, of her factual allegations.  *See generally* doc. 103.  The Court strongly believes that this Memorandum and Order addresses all the allegations in Clayton's complaint that could be construed as claims against Federal Defendants.  To the extent that it appears that the Court failed to address any of Clayton's allegations against Federal Defendants, it is either because:  (a) the Court, despite dozens of hours of carefully studying Clayton's complaint, could not discern the essence of Clayton's allegations, so the Court was not required to afford them a liberal construction, *see Solomon*, 795 F.3d at 787, or (b) Clayton's allegations bore no relevance to any legal basis for relief.  Thus, to the extent that it appears that the Court failed to consider any of Clayton's allegations, the Court did consider them, and the Court finds that they do not change the disposition of Federal Defendants' motions.

As stated above, the Court grants Federal Defendants' motions.

### C.       The Union's Motion to Dismiss

#### 1.       Claims already dismissed

The Union, asserting *res judicata*, moves to dismiss Clayton's duty-of-fair-representation claim that the Court already dismissed with prejudice, namely, those arising before August 2023. Doc. 112-1 at 3–4; *see* doc. 59 at 13.  The Court agrees that *res judicata* bars these claims, so the Court dismisses them with prejudice once again.  *See Satanic Temple v. City of Belle Plaine*, 80 F.4th 864, 871 (8th Cir. 2023) (holding that dismissal of a claim without leave to amend amounts to a "final judgment on the merits for the purposes of claim preclusion").

Clayton asks the Court to revisit its prior dismissal of these claims.  *See* docs. 132, 133. The Court declines to do so.  It thus denies, with prejudice, Clayton's Motion to Vacate, doc. 132.

### 2.    New claim

Clayton attempts to allege a new claim against the Union in her operative complaint:  that the Union failed to process her grievance when she complained about not having been paid for the vacation hours that she used in Summer 2024.  *See* doc. 103 at 3.  The Union moves to dismiss this claim. *See* doc. 112-1 at 4.  The Court agrees.

Although Clayton alleges that the Union failed to timely process her grievance regarding this matter, *see* doc. 103 at 3; *see also id.* at 4 (complaining that the Union "has history & a habit of dragging its foot taking more" than 6 months to settle grievance) in the next breath, in the same pleading, she admits that she "was paid" in August 2024 for the vacation, *id.*, just one month after she herself discovered the issue, *see id.*  These allegations do not give rise to a claim for breach of the duty of fair representation because, given that Clayton admits that her issue resolved itself, the Union's decision not to process her grievance could not have been "arbitrary, discriminatory, or in bad faith."  *Vaca*, 386 U.S. at 190; *see also Iqbal*, 556 U.S. at 678 (holding that, to survive a motion to dismiss, a plaintiff must "state a claim to relief that is plausible on its face").

The Court grants the Union's Motion to Dismiss, doc. 112, with prejudice.

## IV.    Conclusion

Accordingly, the Court orders the following.  The Court grants Federal Defendants' [128] Motion to Strike.  The Court grants the Union's [131] Motion to Strike.  The Court grants Federal Defendants' [72] Motion to Dismiss as to count 13.  The Court grants Federal

Defendants' [106] Motion to Dismiss in full as to counts 1, 4, 10, 11, and 12 and in part as to count 3. The Court dismisses, in full, counts 1, 4, 10, 11, and 12 and dismisses, in part, count 3 against Federal Defendants without prejudice. The Court dismisses, in full, count 13 against Federal Defendants with prejudice and dismisses, in part, count 8 against Federal Defendants with prejudice. The Court grants Federal Defendants' [106] Motion for Summary Judgment, in full, as to counts 2, 5, 6, 7, and 9 and in part as to counts 3 and 8. The Court grants the Union's [112] partial Motion to Dismiss. The Court dismisses Federal Defendants from the case. The Court denies, with prejudice, Clayton's [132] Motion to Vacate. The Court denies as moot the Union's [135] Motion for Joinder and Clayton's [136] Motion to Amend. A separate Judgment accompanies this Memorandum and Order.

So ordered this 26th day of March 2025.

_____
STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE